Good morning, Your Honors. May it please the Court. My name is Seth Hawk, found on behalf of Jacob Matusevich. As a matter of law, the District Court in this case erred in concluding that ground level and grade, as those terms are used in the standard flood insurance policy, are measured from the top of a concrete pool apron and then applying the basement exclusion to my client's claim under that policy. Like a set of stairs or a retaining wall or a deck, a concrete pool apron, as is the case here, is nothing more than an architectural feature that is built atop and resting upon the ground or grade level. You say grade. Isn't the policy better for you than that? Doesn't the policy say below ground level, paren, subgrade? Correct. It does. Those two terms are interchangeable. They're synonymous. So if you eliminate the word below, because it means sub, what I'm saying is ground level and grade are interchangeable and synonymous, as used in the policy. But you're correct, Your Honor, it's below in each case. So you're reading subgrade as a synonym for below ground level, as opposed to reading subgrade as a synonym for ground level? I was using the word subgrade as used in the parentheses of the definition to expand upon the words immediately preceding it, which I recall to be... Right. And there were three words before it. Below ground level, you could read subgrade as a synonym for those three words, which it seems to me that's what you're doing, as opposed to reading it as a synonym for the two words that precede it, ground level. I understood ground level and grade to be interchangeable, as used in this particular definition. The definition itself only uses the words below ground level and subgrade. It does not use conspicuously... Is there anything that circles to the fact that you had to step up from that room to the outside? There is only a .76 inch step up, if you use... Regardless of how high it was, it was measurable. If, only if, Your Honor, you use the upper surface of the concrete apron as the measuring point, and that really goes to the heart of this appeal. Our position is that it is improper to use the upper surface of a concrete apron as the measuring point. My position is that the proper measuring point, given the operative words in the definition at issue, is the earth, the soil. All right. In that respect, what do you have to say about the Lindner case? Well, Lindner was factually distinguishable, number one, and number two, didn't even address the proper measuring point. In Lindner, there was nothing more than crushed gravel being poured atop the earth to raise it to the level of a threshold. Does that make any difference, that it's crushed rather than contained in concrete? It does. There's a significant difference, because in this case, unlike Lindner, we're actually dealing with a structure that was poured upon and built upon the earth. Lindner did not present those facts, and I'm not aware of any case that does present those facts. What we're saying is that... Well, what is a crushed rock if it's not building upon the ground? It's not a structure. All it did is it just elevated the height of the soil. That's really what makes the difference, is the fact that you have elevated structure. But Lindner didn't... There was no structure in Lindner. Here, we're talking about something that's more akin to, as I said earlier, a brick wall, a retaining wall, steps, flight of steps with a landing, a deck or a patio. None of those scenarios were present in Lindner, and that's what we have here. We have something akin to that, and we have an apron, which is four and a quarter inches thick of concrete, which is built upon the soil and earth and the grade immediately below it. Do the steps come down into the house from that apron? There are no steps, Your Honor. Where is the entrance? The entrance is in the rear of the home, and it's what you would perceive as being a classic walkout scenario where you don't ascend any steps or a ramp. You just walk straight out. No, I thought Judge Torreya just established that you have to go up, and when you go up, it is onto the concrete apron. Is that correct? That is factually correct, yes. All right, so the ground level below the concrete apron is where? The ground level is below the apron, around its entire... Yes, but as you enter the lower level of the house, it is not from the ground, is it? It is, well, again, our position is at the ground slash grade. No, no, just in practical terminology. The floodwater came over the concrete apron and down into this room. Isn't that what happened? The floodwater came over the apron, which is on top of the grade, and into the lower level of the home. Here's where I'm having trouble. The soil is three and a half inches below the floor, as I understand it, and then you've got over four inches of concrete poured on top of it. That's right. As I understand your argument, your argument is that if that had been crushed rock and a mixture of soil or whatever, you would lose, but because it's, or Linder says you lose, but because it's cement, you win, and yet when we're looking at the risk here that's being ensured, flood, it would seem an impermeable surface built on top of the soil would be even a greater risk of flooding than would crushed rock. So why would we say the crushed rock, the exclusion applies, cement, it doesn't apply? Because what's happening here is we're heading down a path of, which I believe leads to absurd results, which of course we're to avoid in the sense that if this was hypothetically a set of steps which had a landing, which led to the lower level of the home, and the water poured over the landing of the set of steps that rose up from the ground level, would the landing in that scenario be the ground level slash grade? I suggest not. I suggest that the ground level slash grade in that scenario as it is in this particular case is exactly what it suggests, which is the earth, the soil, it's the grade, and that's our position. So the concern that we have is that if we were to use the apron as the measuring point as the lower court did, we're inviting absurd results if we head down this path. Given this court's decision in Atlas Pellet from 30 years ago, we cannot invite absurd results. It's one of the standard insurance principles that must be applied regardless of whether it's a standard flood policy or not. And that's what we're trying to avoid here. Well, suppose it had been asphalt. For example, we look at a road, don't we refer to the asphalt surface as the grade of the road, and then down underneath you've got the subgrade? I suggest not. I suggest that the grade with all due respect in that scenario is the surface below the asphalt. And what do you point to to support that proposition? Well, I would say that FEMA's own regulations, which I cite on page 18 of my brief, 44 CFR 59.1, one of the definitions that I cite to there is highest adjacent grade. And the term highest adjacent grade, according to FEMA, is highest natural elevation of ground surface prior to construction. So, again, it's the natural elevation of the ground surface prior to construction as used by FEMA in its own definitions. So that would be the support for my proposition. So you're focusing on the word construction. If something is constructed on the soil, it doesn't count as raising the grade. I'm saying that the grade stays the same regardless of whether there's a four and a quarter inch apron or not. The grade remains the same. What you've done is you've added something, an artificial structure, atop grade. That doesn't change the grade. Let me go back to Bill Kayada, Judge Kayada's question about why that would serve the policy interests of the federal government here. You've created a situation in which the floodwaters will come in over the construction and flood the subarea. Congress doesn't want to provide insurance for that occasion. But you would knock it out. I would suggest that not applying the basement exclusion in the facts of this case would be... Well, you can't have it both ways. You seem to be arguing to us that a parade of horribles will follow if on the facts of this case we were to affirm the district court. That's the argument you just made to us. It is. That is the argument. It's one of the arguments. To address your question, Chief Judge Lynch... Go ahead. I would say that affording coverage to someone like Mr. Matusovic in a factual scenario such as we have here is consistent with the insured's reasonable expectations viewed from an objective perspective. Because, again, we're talking about an imperceptible difference here to the naked eye, which was only measured in the context of this lawsuit. Of course, the other three sides are all basement, right? No question, but it has to be all sides. In this particular case, it's not all sides. Didn't you consider it to be a basement? I'm sorry? Didn't your client consider it to have a basement? Did he himself consider that he had a basement? No, Your Honor. On four occasions, he seemed to use the word basement. In my client's affidavit that was before the lower court as part of the summary judgment record, he states that his understanding was that it was not a basement. In the initial SFIP application, he indicated he had a basement. He did so in the declaration pages on October 7th and November 3rd and November 4th. Your Honor, if anything, it creates a tribal factual dispute in the sense that in my client's verd under oath as part of his affidavit that was submitted below, that he was told by the adjuster who came out before the loss when the policy was first procured that this was not a basement. So that was his understanding. That is his testimony. Well, all right. Thank you. Thank you, Your Honors. Thank you. Good morning. May it please the court. My name is Joseph Aguda for Appellee Middlesex Mutual. Your Honors, I want to hit four points that will primarily deal with plaintiff's appellant's reply brief, what he specifically argued in his reply brief, and then what he omitted from his reply brief. Those four points are the framework that's discussed in the appellee's brief of the NFIP. I think the court had a few questions a moment ago that kind of touches on the framework of what we're dealing with here. So we're going to go through a little bit of that background. Well, how about his last argument? I mean, the guy's got a home. He's not sure is this a basement or not. This is complicated stuff. So as I understand it, a representative of your company comes out and says, don't worry, it's not a basement, or we have to assume that for summary judgment purposes. And then he gets flooded and your company says it is a basement. How do you get around that? Well, to use your phrase, Your Honor, to get around it, the law is laid out such that it is the insurer's burden to know exactly what's in his policy, what is covered, what's not covered, and what he needs to do to present a claim. This court's twice looked at this flood program under DaCosta v. Allstate and McGarrett v. American Bankers and has already done a comprehensive analysis of the background and that framework. Here, there are two or three points. So you're saying it makes no difference at all what the representative of your company came to him when he was buying the insurance. He could have sworn up and down 15 different ways to Sunday that it was not a basement. He'd still be out of luck. What's the point? I glean two different scenarios from what Appellant's talking about, one being the initial selling of the policy and then one being when the adjuster came out to adjust the claim. And I can address both. But how about the initial selling? The initial selling of the policy is governed by Federal Crop Insurance v. Merrill from 1947, where the U.S. Supreme Court stated that the terms and conditions of a Federal insurance program are fully charged to the insured. In that case, an agent for the government told a group of farmers that if an X condition happened, they would be covered. That X condition did happen. The claim was made and denied. The Supreme Court said, you were charged with knowing what you had, what was covered, what was not covered. And the farmers lost. That's been a seminal case for flood program litigation since the program started in the early 70s. Which are we talking about here? I took that reference to be the insurance adjuster who came out after there was damage. Understood. Is that what you interpreted it as? I took it as the insurance adjuster coming out. And in that context, under the policy itself, which is codified in Title 44 of the CFR, Article 7J, subpart of 7J states that an adjuster cannot tell you what is or isn't covered. All the adjuster can do is come out, write it up, and then it is then under another condition within Title 44 of the CFR up to the company to determine what is and is not covered after reviewing the adjuster's report. So the adjuster can't bind the coverage or represent that something is or isn't covered based on that. But the adjuster also can't say what is or is not covered and have that bind the company under Federal Crop versus Maryland, the second U.S. court. I'd like to ask a question based more on the facts. And thank you for your brief, which has all sorts of helpful information about congressional policy. But is it the case that there should be per se rules, such as if something is constructed out of concrete that goes up three or four inches above the ground level, that that is always counted, or that it is sometimes a dispositive factor, depending on what the other facts of the case are? Both of you seem to be arguing for sort of per se constructions of statutory language here. And I'm frankly not certain whether that's the appropriate approach to it. Well, Your Honor, the policy is written in plain, unambiguous language. These particular provisions have been looked at several times where district courts and appellate courts have said it's plain and unambiguous. When reviewing... Does it matter? He tries to draw a distinction between, say, four inches of gravel and four inches of concrete. From your point of view, does that make any difference? It does not. That stretches logic under how the provisions are written, plainly. How about a wooden deck? Suppose he put a deck that had four posts that were five inches tall. You're asking me to put my adjuster hat on. No, you can't comment as an adjuster. I think Chief Judge Lynch is getting at you. Where do we draw the line here, or do we have a per se line? How do we... Well... I mean, his principal argument is that your position would cover the deck as well. That's a parade of horribles. Judge Holmes, years ago, said, you know, law is arbitrary in many respects, and you have to draw a line someplace. The line's very simple. Here, it's written in plain English. If the interior is below, not equal to or above, it's a basement. In Appellate's brief, there are several instances where, in referring to the Linder case, he talks about raising the level of the ground, and Your Honor's talked about the crushed limestone a moment ago. Appellate, in plain language, refers to the raising of the level of the ground. So in that instance where you talk about taking an artificially, because Appellate's point is an artificial structure should not count, when you're artificially raising the level of the ground, Appellate himself is still referring to it as the ground. That's... Your Honor, when my toddler falls down and hits his head outside, I say he hit his head on the ground. And how do you read that, in the definition of basement, having its floor level below ground level, and the paren subgrade, n-paren, on all sides? Is subgrade referring to ground level, or referring to below ground level? Because certainly when you just look up the word subgrade in the dictionary, you refer to the grade that's below the grade itself. You have a grade, and then you have subgrading underneath the grade. Well, Your Honor, my response to that is, looking at the program as a whole, and in my brief, I reference natural grade. No human knows the difference between what's natural, and what's just everything else. If we're talking about the dirt, and FEMA takes it a step further, and talks about undisturbed dirt, so even in plaintiff's case, in appellant's case, that dirt had to be, using appellant's position, graded before the concrete was poured in over it. So natural grade doesn't even work for plaintiff in that respect, because that dirt was graded before the concrete pool apron was put in place. Well, we don't know that. It could have been dirt that was hauled in to put under it. It could have been, but it wasn't the undisturbed ground, as defined by FEMA in their flood manual, which specifically deals with underwriting risk. As opposed to the definition cited by plaintiffs, which deal with trying to shy people away from building in riskier areas. It's the second big part of why the program exists, is to mitigate future exposure to the federal fisc. Just briefly, your honors, appellant's brief discussed a couple of the points which were not addressed in appellant's reply brief. One, the idea that, well, the whole background of the program was fully omitted, and as your honor pointed out, that's a big part of why we're here today. We're dealing with a national program that the goal is to maintain uniformity across the country to help, to the extent that it can in today's world, keep the program viable. So it's curious that appellant ignored and made no address of the framework, the foundation under which we're here today. Appellant's argument has to fit within that federal framework, that strict construction framework. It's Middlesex's position that it does not. Thank you. Thank you. Thank you both.